Delphia Audra PYLES, Respondent,

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant.

No. 49943.

Supreme Court of Missouri,

Division No. 1.

Nov. 11, 1963.

James Ruddy, St. Louis, for appellant.

James F. Koester, St. Louis, for plaintiff-respondent.

COIL, Commissioner.

Delphia Pyles was riding in one of St. Louis Public Service Company's buses which was stationary to discharge passengers. It was struck in the rear by the front of another of that company's buses. The jury awarded her $25,000 as damages and the company has appealed from the ensuing judgment.

Appellant here contends that the trial court erred: in giving respondent's damage instruction; in overruling appellant's objection to a portion of plaintiff's counsel's argument; and in admitting testimony as to respondent's children. Appellant also contends that the judgment "was so grossly excessive that it should shock the conscience of the court and be conclusive proof of the fact that it was the result of passion and prejudice on the part of the jury and of misconduct on their part toward the defendant."

Respondent's damage instruction told the jury that if it found for her, then in assessing her damages, "you will allow her such sums as you find and believe from the evidence will fully, fairly and reasonably compensate her" for as many of the four listed items of damages as the jury found she had sustained.

■■ Appellant contends that the instruction "erroneously allowed duplicate compensation" because it "directed," i. e., told the jury "you will allow" damages for the listed items. Appellant does not contend that there was any overlapping of the four listed items or that each of the four was not properly submitted or that there was no evidence to support each item. Appellant's sole argument is that it is improper for an instruction to tell a jury that it "will allow" damages for certain specified items if it finds for respondent and further finds that she sustained damages in the specified particulars. The statement of the proposition indicates that it is fallacious. It is apparent that such an instruction does not allow double damages.

Counsel in jury argument pointed out that prior to the accident respondent had worked every day for years; that she was hard working and regularly employed; that she had not worked since the accident; that she needed to work else she would not have been working. He then said, "You saw the photographs, and you know that she is not living in a wealthy neighborhood—

"[Appellant's Counsel]: I object to that as being an improper type argument, your Honor, going behind [beyond] the scope of the evidence.

"The Court: Overruled.

"[Respondent's Counsel]: I believe that you can surmise from the graphic evidence that was brought forth by the St. Louis Public Service Company that she is not in a neighborhood of wealth, at any rate, and that she was on a job because she had to be on a job, and because she needed to work every day, and that is why she was working every day."

Appellant contends the trial court erred in overruling the objection set forth above. Appellant had introduced in evidence some moving pictures purporting to show the activities of respondent in and about her premises.

■■ It is true that a showing of poverty as such is ordinarily not material to the issues in a damage suit and consequently evidence of such should be excluded. Conrad v. Twin Oaks, Inc., Mo.App., 344 S.W. 2d 286, 288[1]. As we see it, however, the argument here was not a reference to respondent's poverty, as such, but was simply by way of attempting to convince the jury that respondent could not afford to loaf and would be back on her job if her physical condition permitted it. Certainly such is one reasonable interpretation of the argument in question, but even if the relatively unimportant remark should have been excluded, the failure of the trial court to so do could not have constituted reversible error.

Appellant next contends that the trial court erred in failing to sustain its objec-

tion to respondent's testimony that "her daughter was in the hospital and in failing to declare a mistrial when plaintiff on direct examination testified she was unable to sew for her children," on the ground that those arguments were inflammatory and prejudicial. We note in passing that the record does not precisely support the point made in the brief. The record shows that when respondent was testifying as to the doctor she had called after the accident, she was asked whether she had known that doctor before and whether he was recommended by someone. She answered, "Yes, sir, a friend of mine had recommended me to Doctor Pennington as being a good doctor, and then I had a daughter that was in the hospital and he was her doctor." An objection was, "I object to that last as immaterial, about her daughter being in the hospital, it has no bearing on the issues in this lawsuit." (There was no objection on the ground that the answer improperly showed or attempted to show the size of respondent's family, and the court's response at the time he overruled the objection showed that he did not understand that such was the basis of the objection.) In the motion for new trial appellant assigned as error the failure of the trial court to declare a mistrial because plaintiff mentioned that her daughter had been confined in a hospital; and there was no new trial assignment concerning the admission of respondent's testimony that she was unable as a result of her injury to sew for her children.

Be that as it may, however, in describing the result of her injuries respondent said, "Well, I just hurt all the time. I am just not able to do anything like a woman should do her housework, I can't do half the work I should do. I can't do no ironing, and if I hang up three or four pieces of clothes, I have to quit, I can't hang up clothes, and if I sweep my house all the way through, I have got to go lay down, I hardly ever to it because I just can't do it, and I have tried to sew, just mending clothes for the ·children, and I can't do it."

After a following question had been asked, appellant's counsel moved for a mistrial on the ground that by the foregoing testimony respondent was improperly disclosing the fact that she had children.

■ It is true, of course, that the number of children respondent had was not relevant to any issue in the case and if testimony purposes to disclose the size of a litigant's family, it usually should not be admitted. In the present case it does not seem likely that respondent, either in referring to the fact that her daughter's doctor was the one she called, or in describing the results of her disability, intended to disclose the size of her family or that she was, by her answers, trying to elicit the sympathy of the jury. But in any event, the noted incidents, standing alone or taken together, were minor and could not have affected the merits of this action; nor do those two incidents, when considered with the alleged improper argument as to "not living in a wealthy neighborhood," demonstrate reversible error.

The meritorious question on this appeal is whether the verdict is excessive. Appellant's point in its brief is that the judgment is "so grossly excessive that it should shock the conscience of the court and be conclusive proof of the fact that it was the result of passion and prejudice on the part of the jury and of misconduct on their part toward the defendant. The defendant should have a new trial, or, in the. alternative, a substantial remittitur should be ordered."

■ Although the point is not properly made (nowhere in the points relied on is it stated that the verdict is excessive), we shall consider that appellant is contending that the verdict is excessive as well as that it is so excessive as to indicate passion and prejudice and misconduct on the part of the jury. We call attention to the fact that the points are not the same and that one does not include the other. Taylor v. St. Louis Public Service Co., Mo., 303 S.W.2d 608, 612 [7–9].

We state the evidence as to injury and damage from a standpoint favorable to respondent. Respondent was 53 when injured on March 7, 1961. She was employed as a sewing machine operator. She was on her way to work about 7:30 in the morning when the northbound bus in which she was riding stopped on the Twelfth Street viaduct to discharge passengers. Another of appellant's buses ran into the rear of the bus in which she was sitting, causing her to go back and forth twice, her back struck the edge of the seat, her neck was jerked, and she experienced immediate pain. She went to work after the accident where she became nauseated and, although she stayed at work, she was unable to accomplish much. That evening she called a doctor who made arrangements for her to enter Missouri Pacific Hospital that night, where she remained for fourteen days. Upon entry, she had pain in her back, neck, and leg. After discharge from that hospital, where her treatment consisted of complete bed rest, she saw the same doctor twice more and then consulted a neurosurgeon who, in May 1961, performed a myelogram on her at the Missouri Baptist Hospital where she was hospitalized for three days for that purpose. She testified further that the test was painful, made her ill, and caused her to suffer severe headaches. Thereafter, in June 1961, again at the Missouri Baptist Hospital, the same neurosurgeon performed a discogram in an attempt to aid in further diagnosis. The process by which the discogram was done was an extremely painful one. The neurosurgeon recommended that she have an operation for the removal of a disc or discs from her cervical spine. She thereafter last saw the neurosurgeon in the fall of 1961.

Respondent testified further that prior to the accident she was in good physical condition and had worked regularly; that she had been unable to work since the accident except for an attempt to do housework; that the usual housework tasks caused her to tire quickly and made frequent rests

necessary; that she hurt all the time; that she used liniment and various pills for pain; that her back was some better but still bothered her; that her neck was worse and often swelled; that at times she could not use her right arm; that at times her right leg bothered her and the pain radiating down her leg had for a while caused her to drag her foot; that she had used a cane off and on for almost a year; that it hurt when she worked her neck from side to side; that sometimes she could hardly get up.

The evidence showed that at the time of the accident respondent was making $1.12 per hour; that she was on piecework; that in 1960 there were six paydays on which she received in excess of $50 a week net and that on the other paydays she received less than $50 a week. Her hospital and doctor bills amounted to $936 and at trial time she had lost wages in excess of $2,400.

Doctor Pennington saw respondent on March 8 after she was admitted to the hospital at his direction. He found muscle spasm in the lumbar area of the back symptomized by extreme pain. He prescribed complete rest on a stiff bed. He called in another doctor to deal, if necessary, with a diabetic problem which had nothing to do with this accident. Mrs. Pyles was released from the hospital March 21. After her release he again examined her and found that she continued to have spasm of the low back muscles, greater on the left side, and tenderness in the area of the third and fourth lumbar vertebrae. He found no limitation of motion in her back. He examined her two weeks later and she complained of soreness on her left side near the left sacroiliac joint. He last saw her on April 14, 1961.

Dr. Schaerer, a neurosurgeon, examined respondent on April 26, 1961, and found an increased curvature forward of the low back area with palpable spasms of the muscles concerned, particularly on the left side, a lumbar sacral tenderness with pain radiating to the calf of the right leg upon

deep pressure; that the right ankle jerk was diminished and there was diminished sensation to pinprick over the outside of the left foot; that a tender spot existed over the upper medial angle of the right shoulder blade and there was limitation of motion of the right shoulder joint; that there was tenderness over the lower portion of the cervical spine in front and tenderness of certain muscles on the right. He performed a myelogram on Mrs. Pyles in May 1961, and in June did a discogram. He described both processes. In performing a discogram he inserted dye, by means of a very fine needle, into the central portion of the disc in question; if the disc was in good condition and position, the dye would stay in the central portion around the needle point; if there was a tear in the disc the dye would follow the tear into the disc's periphery. In some cases the dye would outline a herniated piece of disc and in others would only indicate that there was a tear. The doctor said that if the disc was normal this process would be essentially painless, while if the disc was torn or herniated the process would produce the same kind of pain the patient had been having as a result of the herniated disc. Based upon the myelogram and the discogram, the doctor's final diagnosis was that appellant had ruptured cervical discs at C4–5 and C5–6; that he did not determine whether there was a ruptured disc at C3–4 because the discogram procedure had by then become so painful to respondent that he could not pursue it further.

The doctor was of the opinion that respondent was permanently injured by reason of these ruptured discs; that the only thing that would have a chance to give her relief would be the removal of the discs followed by a bony fusion of the vertebrae to eliminate the abnormal motility which was present. He recommended such an operation in this case but said there was no assurance that it would be successful; that he has obtained good results from such procedure in about 80 per cent of the cases operated; that he could not offer any medical treatment which would give relief; that his charge for the operation would be $1,500; that in his opinion respondent is unable at present to do any lifting on an eight-hour-a-day job of the type at which she was working at the time of the injury; that even if she had the operation, she would not be able to work steadily at such a job; that she would have pain and suffering in the future.

We need not here again set forth the many factors we consider in attempting to reach a reasonable conclusion as to whether a certain judgment is excessive. Suffice it to say in this case that we have examined the cases cited by the parties in support of their respective positions, as well as other cases. We have noted the fact that the trial judge overruled appellant's motion for new trial which contained both the grounds that the verdict was excessive and was so excessive as to indicate prejudice and misconduct on the part of the jury. We have considered that respondent's special damage to trial time was about $3,400. We have recognized that respondent was a wage earner, earning about $180 per month, whose future earning capacity is impaired, the extent of such impairment being speculative, in that it apparently depends upon whether she is operated and, if so, the result thereof. We have found the cases of Riggs v. Metcalf, Mo., 315 S.W.2d 791, 796–801, and Chambers v. Missouri Pacific R. Co., Mo., 356 S.W.2d 64, 69, 70 (and cases therein cited), particularly helpful in reaching a conclusion in this case.

We have reached the conclusion that we should not be justified in holding that the judgment herein is excessive. It follows that we need not notice further appellant's contention that the size of the verdict should be "conclusive proof" that it resulted from the jury's prejudice and misconduct.

The judgment is affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.